# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| RICKY COOPER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV 5:10-cv-1434-IPJ |
| | ) | |
| CAVALIER HOMES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### Procedural Background

Pending before the court are defendant's, Cavalier Homes Inc. ("Cavalier"),

motions for summary judgment as to plaintiffs, Troy Batey ("Batey")(doc. 21),

Robert Jeffreys ("Jeffreys")(doc. 22), Ricky Cooper ("Cooper")(doc. 23), and

Terry Lockhart ("Lockhart")(doc. 24), the respective briefs in support (doc. 25-

28), and evidentiary materials (doc. 29); plaintiffs' motion to strike (partial)

declaration of Chris Newell (doc. 31), and plaintiffs' consolidated response (doc.

32); and defendant's reply (doc. 34).

### Factual Background

1

Cavalier produces manufactured homes (mobile homes) at several locations in Alabama including plants in Addison and Hamilton (the "Buccaneer" plant). Newell[1] Decl., ¶ 2 (doc. 29-5, Ex. G).  These manufactured homes are ultimately sold to the public, primarily through retail dealers, in Alabama, Mississippi, Louisiana, Texas, Arkansas, Kansas, Missouri, Oklahoma, Tennessee, Kentucky, Georgia, Florida, South Carolina and other states.  Newell Dep., at 12 (doc. 29-5, Ex. E).  Cavalier's manufactured homes carry a one year warranty after purchase by the end consumer.  *Id*. at 13.  To service its warranty obligations, Cavalier employs Service Technicians ("Service Techs") and Service Tech Helpers ("Helpers") to perform warranty, service and repair work on the manufactured homes sold by Cavalier.  *Id*. at 13.; Lockhart Dep., at 41-42 (doc. 29, Ex. A).  This work is performed after the house has been shipped from the plant and is on the retail dealer's lot or the buyer's property.  Lockhart Dep., at 36 (doc. 29, Ex. A).  The Service Techs are supervised by a Service Manager who is responsible for making sure that warranty repairs are properly performed on the sold manufactured homes.  Newell Dep., at 10 (doc. 29-5, Ex. E).

---

[1] Chris Newell is the Service Manager at Cavalier Homes in Addison, Alabama.  Newell Decl., ¶ 1 (doc. 29-5, Ex. G).

Service Techs drive Cavalier service trucks[2] (not their personal vehicles) to their out-of-state work assignments. Lockhart Dep., at 44 (doc. 29, Ex. A). Helpers travel on and drive (or are available to drive) Cavalier service trucks to their out-of-state work assignments. Jeffreys Dep., at 51-52 (doc. 29-3, Ex. D), 66 (doc. 29-4, Ex. D). These service trucks are the size of a moving truck and weigh approximately 26,000 pounds. Newell Dep., at 21 (doc. 29-5, Ex. E); Lockhart Dep., at 45, 80 (doc. 29, Ex. A). Service Techs are also required to operate the service trucks in a safe manner, obeying all traffic rules and regulations. *See e.g.*, Lockhart Dep., at 63-65 (doc. 29, Ex. A).

Most of the tools required to perform the repair/warranty work, such as ladders, air guns, skill saws, saws, hammers, screwdrivers, nail guns, *etc.*, were owned by Cavalier and transported by the Service Techs in the Cavalier service truck to the out-of-state work assignments. Lockhart Dep., at 46-47(doc. 29, Ex. A). The Service Techs also transported the Cavalier building materials, such as carpet, sheetrock, roofing materials, linoleum, molding, light fixtures, *etc.*, that were necessary to perform the out-of-state repair and warranty work. *Id*., at 47-48.

Batey was employed by Cavalier as a Service Tech at its

---

[2] The service trucks are owned or leased by Cavalier. Newell Dep., at 21(doc. 29-5, Ex. E); Lockhart Dep., at 44 (doc. 29, Ex. A).

Hamilton/Buccaneer plant from March 2005 until July 2009.  During the majority of his employment with Cavalier, Batey regularly performed service/warranty work in Louisiana.  Batey Dep., at 47-48 (doc. 29-3, Ex. C).  Batey regularly drove a Cavalier service truck from the Hamilton/Buccaneer plant in Alabama to work assignments in Louisiana.  *Id*., at 50, 75.  Batey typically worked a ten-day work cycle—*i.e.*, ten days on and four days off.  *Id*., at 49, 67.  On the first day of the ten-day work cycle, Batey drove the Cavalier service truck from Alabama to Louisiana, which was usually at least an 8-10 hour drive.  *Id*., at 75-76.  On each work day thereafter, Batey typically drove Cavalier's service truck between 15-45 minutes each way from the hotel to the local work assignment(s) and back.  *Id*., at 77).  On the tenth day, Batey drove the Cavalier service truck approximately 8-10 hours from Louisiana back to the Hamilton/Buccaneer plant in Alabama, unloaded materials off the truck, turned in any paperwork, and then drove the Cavalier service truck home and kept it at his house.  *Id*., at 75-76.

Jeffreys was employed by Cavalier as a Service Tech Helper at its Hamilton/Buccaneer plant from 2005 until August 2009.[3]  Jeffreys Dep., at 17- 18, 22 (doc. 29-3, Ex. D).  During the majority of his employment with Cavalier,

---

[3] Jeffreys worked as a Service Tech Helper for Plaintiff Troy Batey for approximately two years.  In 2009, Jeffreys worked with Service Techs other than Batey for approximately four months.  Jeffreys Dep., at 31-32 (doc. 29-3, Ex. D).

Jeffreys regularly performed service/warranty work in Louisiana.  *Id*., at 37.
Jeffreys typically worked a ten-day work cycle—*i.e.*, ten days on and four days
off.  *Id*., at 38.  On the first day of the ten-day work cycle, Jeffreys drove or
traveled in and was available to drive the Cavalier service truck from Alabama to
Louisiana, which was usually at least an 8-10 hour drive.  Batey Dep., at 75-76
(doc. 29-3, Ex. C); Jeffreys Dep., at 40 (doc. 29-3, Ex. D), 58-59 (doc. 29-4, Ex.
D).  On each work day thereafter, Jeffreys typically drove or traveled in (and was
available to drive) Cavalier's service truck between 15-45 minutes each way from
the hotel to the local work assignment(s) and back.  Batey Dep., at 77 (doc. 29-3,
Ex. C); Jeffreys Dep., at 61-63 (doc. 29-4, Ex. D).  On the tenth day, Jeffreys
either drove or traveled in (and was available to drive) the Cavalier service truck
approximately 8-10 hours from Louisiana back to the Hamilton/Buccaneer plant in
Alabama, unloaded materials off the truck, and turned in any paperwork.  Batey
Dep., at 49, 75-76 (doc. 29-3, Ex. C); Jeffreys Dep., at 61 (doc. 29-4, Ex. D).

Cooper was employed by Cavalier as a Service Tech at its
Hamilton/Buccaneer plant from 1997 until June 2009.  Cooper Dep., at 22, 34
(doc. 29-2, Ex. B).  During his last three years of employment with Cavalier,
Cooper was regularly assigned service/warranty work in South Louisiana.  *Id*., at
49-50.  Cooper typically worked a ten-day work cycle—*i.e.*, ten days on and four

days off.  *Id*., at 52-53, 72.  On the first day of the ten-day work cycle, Cooper

drove the Cavalier service truck from Alabama to Louisiana, which was usually at

least an 8 hour drive.  *Id*, at 69, 76-77.  On each work day thereafter, it was not

unusual for Cooper to drive three or more hours from the out of state motel to his

local (i.e., Louisiana) work assignment(s) and back.  *Id*., at 74-75, 78.  On the

tenth day, Cooper drove the Cavalier service truck 8-10 hours from Louisiana

back to his home in Carbon Hill, Alabama, and kept the service truck at his house

*Id*., at 59, 70-71, 76-77.

Lockhart has been employed by Cavalier as a Service Tech at its Addison

and Hamilton plants since 2006.  During his employment as a Service Tech with

Cavalier, Lockhart performed most of his service/warranty work in South

Carolina, North Carolina, Georgia and Florida.  Lockhart Dep., at 40 (doc. 29, Ex.

A).  Lockhart typically worked a ten-day work cycle—*i.e.*, ten days on and four

days off.  *Id*., at 48, 54.  On the first or second day of the ten-day work cycle,

Lockhart drove the Cavalier service truck from Alabama to his out of state work

assignment.[4]  On each work day thereafter, Lockhart drove Cavalier's service

---

[4] At the start of each ten-day work assignment, Lockhart drove the Cavalier service truck to the plant so that it could be loaded with supplies, materials and tools needed to accomplish his upcoming out of state work assignments.  If the loading took a long time, he would delay his drive to the out of state location until the next day.  Lockhart Dep., at 54-55 (doc. 29, Ex. A).

truck from the out of state hotel to his local work assignment(s) and back.  *Id*. at

55.  On the tenth day, Lockhart drove the Cavalier service truck from his out of

state work assignment back to Alabama and, time permitting, unloaded materials

off the truck and turned in any paperwork.  *Id*., at 59-61.  Lockhart would typically

work 6-12 work orders (i.e., individual warranty/service jobs) per 10 day

assignment.  *Id*., at 58.

In January 2009, Cavalier changed its method of paying Service Techs from

hourly to salary.[5]  Lockhart Dep., at 33 (doc. 29, Ex. A).  Since January 2009, the

Service Techs and Helpers have been paid a fixed weekly salary, which is

compensation for all hours worked.  *Id*., at 89-90.  Plaintiffs claim that for the last

three years defendant has violated the FLSA by failing to pay plaintiffs overtime

for hours worked over 40 in a work week.


## Summary Judgment Standard

A moving party is entitled to summary judgment if there is no genuine issue

of material fact, leaving final judgment to be decided as a matter of law.  *See* FED.

R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

---

[5] Even after the Service Techs were switched from hourly to salaried, Cavalier continued
to pay them a $25 per diem for meals and reimbursed them for all travel and out-of-pocket
expenses.  Lockhart Dep., at 56-57 (doc. 29, Ex. A).

587, 106 S.Ct. 1348, 1355-56 (1986). The facts, and any reasonable inference

therefrom, are to be viewed in the light most favorable to the non-moving party,

with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress &*

*Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970).

A party opposing a properly submitted motion for summary judgment may

not rest upon mere allegations or denials of his pleadings, but must set forth

specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*,

901 F.2d 1578, 1580 (11th Cir. 1990). The non-moving party's evidence on

rebuttal must be significantly probative and not based on mere assertion or merely

be colorable. *See* FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine

issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).


**Legal Analysis**

The Fair Labor Standards Act ("FLSA") requires employers to compensate

covered workers a minimum of one and one-half times the workers' hourly wages

for hours exceeding forty hours worked in a single week. 29 U.S.C. § 207(a)(1).

However, exemptions to this overtime requirement exist for "any employee with

respect to whom the Secretary of Transportation has power to establish

qualifications and maximum hours of service pursuant to the provisions of section

31502 of Title 49 [ *i.e.,* the Motor Carrier Act]." 29 U.S.C. § 213(b)(1).  The 11th

Circuit Court of Appeals has stated that in order to be subject to the motor carrier

exemption, two requirements must be met by an employee:

> (1)  his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA [*e.g.*, is a motor private carrier]; and
> (2)  the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

*Abel v. Southern Shuttle Services, Inc*., 631 F.3d 1210, 1213 (11th Cir. 2011).  The

Motor Carrier Act ("MCA")  broadly defines "motor private carrier" as a person

other than a motor carrier, transporting property by motor vehicle when –

> (A)  the transportation is provided in section 13501 of this title [interstate transportation];
> (B)  the person is the owner, lessee, or bailee of the property being transported; and
> (C)  the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102 (15).  For the purposes of this summary judgment motion,

plaintiffs do not dispute that Cavalier is a "motor private carrier" under the MCA.

However, plaintiffs do dispute the second requirement of the motor carrier

exemption to the FLSA – that plaintiffs' business-related activities directly affect

the safety of operation of motor vehicles in the transportation on public highways

of property in interstate commerce.[6]

Cavalier correctly contends that courts have found driving in and of itself

directly affects the safety of operation of a motor vehicle.  For purposes of the

MCA, a *driver* includes:

> Individuals whose driving duties are concerned with transportation some
> of which is in intrastate commerce and some of which is in interstate or
> foreign commerce within the meaning of the Motor Carrier Act; [and]
> individuals who ride on motor vehicles engaged in transportation in
> interstate or foreign commerce and act as assistant or relief drivers of the
> vehicles in addition to helping with loading, unloading, and similar
> work.

29 C.F.R. § 782.3(a) (2011).  The plaintiffs do not dispute that their work as

Service Techs and Service Tech Helpers qualified them as *drivers* under the MCA.

The Code of Federal Regulations additionally states that "[t]he work of an

employee who is a full-duty or partial-duty 'driver,' as the term 'driver' is above

defined, directly affects 'safety of operation' within the meaning of section 204 of

the Motor Carrier Act whenever he drives a motor vehicle in interstate or foreign

---

[6] Plaintiffs actually admit in the complaint that the *interstate* portion of the second
requirement of the FLSA exemption is satisfied.  Compl., ¶ 22 (doc. 1).

commerce within the meaning of that act."[7]  29 C.F.R. § 782.3(b) (2011) (*citing Levinson v. Spector Motor Service*, 330 U.S. 649 (1947)).  The emphasis is on the "'character' of the employees' activities, not the proportion of time spent engaged in activities directly affecting interstate safety."  *Anderson v. Timber Products Inspection, Inc.*, 334 F.Supp.2d 1258, 1262 (D. Or. 2004)(*citing Levinson v. Spector Motor Service*, 330 U.S. 649, 674-75 (1947)).[8]

    In *Anderson*, the plaintiffs worked for a lumber and wood products inspection company.  The plaintiffs job duties at times entailed traveling interstate while carrying tools provided by their employer for use in inspecting the lumber.  *Anderson*, 334 F.Supp.2d at 1260.  The court found that "because the plaintiffs here undisputedly drove interstate as part of their duties, it does not take much to

---

    [7] An employee is not exempt solely by the fact that he is a *driver*.  "He is not exempt if his job never involves transportation in interstate or foreign commerce within the meaning of the [MCA] ... or if he is employed by a private carrier and the only such transportation called for by his job is not transportation of property.  29 C.F.R. § 782.3(b) (2011).  In 29 C.F.R. § 782.3(b), the Secretary of Labor distinguishes the case relied upon in plaintiffs' brief in opposition, *Colbeck v. Dairyland Creamery Co.*, 17 N.W.2d 262 (S.D. 1945).  The Secretary of Labor describes *Colbeck* as a case where a "driver of truck used only to transport himself to jobsites, as an incident of his work in servicing his employer's refrigeration equipment, held non exempt."

    [8] "Although courts have recognized a *de minimis* exception, that exception has force, at least as applied to drivers, only when the interstate-travel portion of the employees' work can be characterized as 'infinitesimal.'  As observed by one court, in those cases in which the *de minimis* exception has been applied, the employees had 'spent less than one percent of their time in interstate travel.'" *Anderson*, 334 F.Supp.2d at 1262 (citations omitted).

find they directly affected the safety of interstate operation of motor vehicles."[9]

*Id.*, at 1263; *see also Friedrich v. U.S. Computer Services*, 974 F.2d 409, 418 (3rd Cir. 1992)(finding that where the plaintiffs traveled interstate with computer tools and component parts for installation and repairs, "it is not determinative that the plaintiffs may have devoted more time to field service than to the transportation of property.  Because their interstate operations affected safety on the highways, the plaintiffs fell within the MCA even though they were not employed primarily as carriers").  In an 11th Circuit case, the plaintiff employee conceded from the outset that he affected the safety of operation of motor vehicles because he drove on public highways.  *Mena v. McArthur Dairy, LLC*, 352 Fed.Appx 303, 305-306 (11th Cir. 2009)("Mena regularly drove his truck on public streets and interstate highways, including I-95.  In compliance with DOT regulations, Mena conducted a safety pre-inspection before driving any of McArthur's trucks.  Moreover, Mena kept a notebook containing an inspection checklist 'in case [he was] stopped by the DOT'").

Similar to those cases, plaintiffs here drove interstate on public highways while transporting Cavalier's tools and supplies in furtherance of their commercial

---

[9] The court found also that even though the plaintiffs spent more time inspecting lumber than driving interstate while carrying its employer's property, they did not fall into the de minimis exception.  *Anderson*, at 1263.

enterprise.  While plaintiffs cite to *Colbeck* to support their argument, it is a 1945 case decided by a state court and it stands against the weight of subsequent federal authority.[10]  Further, unlike the *Colbeck* case, the plaintiffs in this case spent a significant amount of time driving approximately 26,000 pound service trucks[11] – vehicles subject to DOT regulation – carrying tools and supplies.[12]  Batey, Cooper, and Lockhart as Service Techs were all *drivers* under 29 C.F.R. § 782.3(a), and by spending a significant proportion of their time driving interstate

---

[10]  *See Sinclair v. Beacon Gasoline Co.*, 447 F.Supp. 5 (W.D. La. 1976), aff'd, 571 F.2d 978 (5th Cir. 1978); *see also Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 209 (1st Cir. 1972) ("It is obvious that one who drives a vehicle in interstate commerce directly affects the safety of such operations"); *Benson v. Universal Ambulance Serv., Inc.*, 675 F.2d 783, 786 (6th Cir. 1982)(After stating that "[i]t would appear to be beyond question that the driver of a common carrier vehicle directly affects the safety of operation of that vehicle," the court remanded to determine whether the plaintiffs on an individual basis, not the defendant as an entity, affected safety of operation); *Ellis v. All My Sons Moving & Storage of Orlando, Inc.*, 2009 WL 1587175, *4 (M.D. Fla. 2009)("The work of a full or part-time driver directly affects safety of operation within the meaning of section 204 of the Motor Carrier Act whenever he drives a motor vehicle in interstate or foreign commerce within the meaning of the act"); *Vidinliev v. Carey Int'l, Inc.*, 581 F. Supp.2d 1281 (N.D. Ga. 2008)("Defendants have demonstrated that the Plaintiffs affect "safety operation" by pointing out that they belong to a class of full-time limousine drivers").

[11]  Colbeck drove a "light truck" (non-DOT regulated) on his way to repairing the larger refrigeration trucks (DOT regulated) that were owned by the defendant and used to transport defendant's goods in interstate commerce.  *Colbeck* 17 N.W.2d at 265.  In that case, the court found that "[p]rimarily the work of appellant in servicing the [refrigeration] trucks was directed toward the preservation of the frozen goods being transported.  If his work in any manner affected safety of operation of the [refrigeration] motor vehicle it was only incidental."  *Id.*

[12]  "[Colbeck] was a refrigerator service man.  His occupation was servicing equipment belonging to respondent.  The operation of the light truck was simply incidental to appellant's occupation, and at the most consumed only a small part of his working time."  *Colbeck*, 17 N.W.2d at 266.

13

transporting tools and supplies, they fall well outside of the *de minimis* exception. Jeffreys, as a Service Tech Helper, also falls within the definition of a *driver* under 29 C.F.R. § 782.4(a), and even though his duties that affect the safety of operation of the motor vehicle may have been a minor, he still affected the safety of operation of a motor vehicle.

This interpretation – that driving in and of itself affects safety of operation – will not read the word "and" out of the law as plaintiffs suggest.  The federal regulations state:

> The exemption is applicable, under decisions of the U.S. Supreme Court, to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper, loader, or mechanic, ***and*** (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2(b)(2) (2011) (emphasis added).  First, even if driving itself affects safety of operation, it still must be established that the property is being transported in interstate commerce.  Second, the safety of operation element must still be established by other means for loaders and mechanics.  Thus, finding that driving itself affects safety of operation would not eliminate the "and" from the law.

As such, there is no genuine issue of material fact as to whether plaintiffs

were affecting the safety of operation of a motor vehicle in the transportation on

public highways of property in interstate commerce.

## Conclusion

Having considered all of the foregoing, the court is of the opinion that

defendant's motions for summary judgment (docs. 21-24) are due to be

**GRANTED**, which the court shall do by separate order.

**DONE** and **ORDERED** this the 27th day of July 2011.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE